IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 31, 2003

# IN RE: ADOPTION OF KRISTINA MARIE McCRONE AND JAMES EDWARD McCRONE

# JOAN RUTLEDGE McCRONE v. JASON LEE RICHARDSON

**An Appeal from the Chancery Court for Shelby County**
**No. CH-01-0321-1     Walter L. Evans, Chancellor**

---

**No. W2001-02795-COA-R3-CV - Filed July 21, 2003**

---

This case involves the termination of parental rights and awarding custody to a non-parent. The parents of the minor children at issue were divorced on February 7, 2001. The father did not appear in the divorce proceedings. The court found that the father had abandoned the children and awarded the mother full custody. The next day, on February 8, 2001, the mother died. After her death, the petitioner (the children's maternal grandmother) took physical custody of the children. On February 14, 2001, the grandmother filed a petition to adopt the children. On the same day, the father filed a petition for custody of the children. After a bench trial, the trial court denied the grandmother's petition for adoption and granted the father's petition for custody, determining that the father had not abandoned the children and that substantial harm would not result from his having custody. The grandmother now appeals that order. We reverse, finding that undisputed evidence establishes that the father willfully abandoned his children, and we remand to the trial court for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Reversed and Remanded**

HOLLY KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Anthony Helm, Bartlett, Tennessee, for the appellant, Joan Rutledge McCrone.

Barbara B. Johnson, Bartlett, Tennessee, for the appellee, Jason Lee Richardson.

**OPINION**

This case involves children in turmoil. The children, Kristina Marie McCrone (born July 25, 1995) and James Edward McCrone (born January 23, 1997) (collectively, "children"),[1] were born during the marriage of their parents, Respondent/Appellee Jason Lee Richardson ("Father") and Kathryn Elaine Richardson ("Mother"). The parties separated in September 1998. Sometime in 1999, Father moved to Birmingham, Alabama, where his mother and stepfather reside. A preliminary order requiring Father to pay child support of $125.00 per week was entered in 1999. Father, however, paid only two or three months of support despite the fact that he was employed.

During this time, Mother lived in a home close to her mother, Petitioner/Appellant Joan Rutledge McCrone ("Grandmother"). Grandmother frequently cared for the children, particularly since Mother was attending school to become a paralegal and also suffered from Crohn's Disease and other health problems. Grandmother kept the children at her house approximately five days a week, with the children in effect living at both homes. Grandmother also provided considerable financial support.

In the divorce proceedings between Mother and Father, Father defaulted, and much of Mother's case against Father was uncontested. Mother submitted a proposed parenting plan which gave full custody of the children to Mother and found that Father had willfully abandoned his children "for an extended period of time." The proposed parenting plan provided that Father "shall have no residential time with the children until further orders of the Court." The parenting plan submitted by Mother was adopted by the trial court and incorporated into the final decree. The divorce decree also ordered Father to pay Mother $500 per month in child support.

The final decree of divorce was entered on Wednesday, February 7, 2001. The next day, Thursday, February 8, 2001, Grandmother, James, and Kristina walked in Mother's home and found that she, unexpectedly, had died.

After Mother's sudden death, the children lived with Grandmother. On February 12, 2001, the Monday after Mother died, Father went with two police officers to Grandmother's house and insisted that Grandmother give him immediate custody of the children. Grandmother cited the divorce decree and refused to let the children go with Father. On the day of Mother's funeral, Father called Grandmother to ask if he could take the children out to eat. Grandmother did not permit him to, but invited Father to visit with the children in her home the next day.

Shortly thereafter, on February 14, 2001, Grandmother filed a petition in the trial court below to adopt the children, and also seeking an injunction to prevent Father from taking custody of the children. Grandmother's petition claim that Father's residence was unknown, and that "there has

---

[1]The children's last name is actually Richardson, the same as their parents. However, the petitioner used McCrone as the children's last name in the petition, according to her interpretation of the adoption statutes, and we will refer to them in that manner in this Opinion.

been full compliance with the law in regard to consent to this adoption and/or termination of parental rights by all birth and/or legal parents." Grandmother asserted in the petition that the parenting plan approved by the divorce court conclusively showed that Father "willfully abandoned the said minor children for more than four consecutive months immediately preceding the filing of this petition," and that Father's involvement with the children may have an adverse impact on the children.

On the same day, February 14, 2001, Father filed a petition for custody of the children. He asserted that he should have custody because he was their natural father and maintained that he was a fit and proper person to have permanent custody. Both Grandmother's petition and Father's petition were assigned to the same trial judge.

On March 8, 2001, the trial court conducted a preliminary hearing. Grandmother was awarded temporary custody of the children pending a full and final hearing on both petitions. Father was given visitation every other weekend. A second hearing was held on April 3, 2001, at which Father was granted a continuance in order to prepare for Grandmother's expert witness.

On May 17, 2001, the trial court granted Grandmother's request for a continuance. At this hearing, the trial court in effect reversed the visitation arrangement. The trial court allowed Father to have custody of the children from Sunday evening through Friday afternoon, with Grandmother to have custody on the weekends.

On June 11 and 12, 2001, a full bench trial on both petitions was conducted. The record does not indicate whether the two petitions were formally consolidated. Nevertheless, the trial court considered contemporaneously the issues involved in both Grandmother's petition for adoption and Father's petition for custody.

At trial, Father and Grandmother each presented expert testimony. Psychologist John Robert Hutson ("Dr. Hutson"), testifying on behalf of Father, met with both Father and Grandmother and evaluated the ability of both to parent the children. Dr. Hutson concluded that he "saw no psychological reason why [Father] was not capable of raising his children." He referred to a report he had done in May 2001 in which he noted that Father was living with his then-fiancee, Nancy Richardson ("Stepmother"), her fifteen-year-old son, and her mother in the mother's home in Lakeland, Tennessee.[2] Dr. Hutson recommended in his report that Father "resolve his relationship" with his fiancee, and that he establish an independent residence. He also recommended that Father attend a parenting training program and temporarily leave the children with Grandmother.[3] Dr. Hutson also opined in his report that "[n]either adult in this case seems to be that focused on the growing education requirements of these children, although I believe [Grandmother] has given it a bit more thought than [Father]." As to Grandmother, Dr. Hutson stated that he saw "no evidence of

---

[2] Nancy was formerly married to Father's brother, and her son is Father's nephew.

[3] By the hearing date in June 2001, Father had married Stepmother and had attended parenting classes, but they were still living with his mother-in-law. Father said that he and Stepmother were married on May 12, 2001, after having lived together for about two and one-half years.

any psychopathology with Ms. McCrone."[4] He also testified that both Father and Grandmother were obstacles to the children having a relationship with the other adult.

Psychologist Rebecca Caperton ("Dr. Caperton") testified at trial on behalf of Grandmother. In March 2001, Grandmother brought the children to be treated by Dr. Caperton to help them cope with the loss of Mother and, eventually, with the transitions between Grandmother and Father. Dr. Caperton was not able to perform a custody evaluation, because Father did not meet with her. Pursuant to instructions by the trial court, Dr. Caperton attempted to meet with Father on several occasions. However, Father did not keep the appointments.[5] Dr. Caperton testified that their mother's death had a very dramatic effect on the children. Dr. Caperton concluded that it would be psychologically harmful to the children to take them away from Grandmother, because Grandmother's home had become familiar to them over the previous two years, and because the children were very attached to Grandmother. Dr. Caperton was also concerned because Father had not contacted her before trial to discuss the children, and worried that Father's pattern of coming in and out of the children's lives would persist. Dr. Caperton stated her fear that, if custody were given to Father, Grandmother "would be totally alienated from the picture . . . and . . . there will be no respect for the bond between [Grandmother] and children." Dr. Caperton explained that children experience a sense of abandonment when their mother dies, and that these children would experience abandonment again if they lost contact with Grandmother.

Grandmother testified at trial on her own behalf. Grandmother had worked as an administrator for Kraft Foods for thirteen years, and said that she was in a financial position to care for the children. She testified that she had supported the children and Mother completely for two years, with state assistance. Grandmother asserted that, in the two years prior to the filing of her petition, Father did not visit the children. She noted that she lived very close to Mother, and testified that, since June 2000, the children had spent five out of seven days a week at her house. Grandmother said that the children considered her home to be their home as well. Although Father had been ordered to pay $500 per month in child support to Mother, Grandmother emphasized that he had paid only a total of $625 in support. Grandmother recalled the incident on February 12, 2001, immediately after Mother's death, when Father came to her home to take the children with him. She said that Father also called on the day of Mother's funeral to take the children out to eat. Grandmother explained that she did not permit the children to go out to eat with him that day, because she thought they needed to be with their family. Grandmother asserted that, since Father had been having visitation with the children pending trial, they had been clingy to her and very confused about their living arrangements. She said that she did not have a problem with Father having visitation with the children, but was concerned, given his history, that he would leave them again. Grandmother testified that she petitioned the court to adopt the children so that she could give

---

[4]Dr. Hutson stated that it troubled him that Grandmother did not seem to grieve her daughter's death. He later said, however, that Grandmother's personality test reflected evidence of depression, which would confirm that she was grieving normally.

[5]Dr. Caperton agreed to reduce her hourly rate from $125 to $100 for Father's visits.

them a stable home and provide them with good insurance. She said that she planned to continue to taking the children to see Dr. Caperton to help them cope with their loss.

Father testified on the second day of trial. He said that he moved to Birmingham, Alabama in 1999. Since May 2001, however, Father has lived with Stepmother, her son, and her mother in the mother's home in Lakeland, Tennessee. Father testified about his background. Father described his job history, primarily as a truck driver, and said that he had not been unemployed for any significant amount of time. Father had been married prior to his marriage to Mother and had two children from his first marriage. He testified that, after a long legal battle with the mother of those children, he surrendered his parental rights so that they could be adopted by their mother's new husband.

As to James and Kristina, Father testified that he tried to visit with them when his trucking routes took him through Memphis, although he did not specify the dates of these attempts. Father acknowledged his failure to send child support on a regular basis, but explained that sometimes he "didn't make a whole lot of money on the road. It just depends on the runs you get and the miles you run." Father disputed Grandmother's assertion that he had not seen James and Kristina in the two-year period prior to the filing of Grandmother's petition. He admitted, however, that he had not visited with them at any time after January 2000. Father testified that he had tried several times to contact Mother and the children to set up a visit, but that Mother was not cooperative. To support that claim, Father introduced into evidence an e-mail he wrote to Mother on October 19, 2000, telling Mother that he wanted to arrange a visit with the children and giving her his telephone number. Also entered into evidence was Mother's reply e-mail, acknowledging the receipt of Father's e-mail and informing him that "[i]t has been 6+ months since the last child support was received." Father also introduced into evidence a picture of him with the children that was taken in Birmingham in August 1999, to refute Grandmother's assertion that he had not seen James Kristina in two years.[6]

On July 25, 2001, the trial court entered an order finding that "[Father] has not willfully abandoned the children," and consequently denying Grandmother's petition for adoption. Concluding that "the children are not at substantial risk of harm in the custody of [Father]," the trial court granted Father's petition for custody.

On August 9, 2001, Grandmother filed a motion for a new trial and/or to amend the judgment to grant her petition for adoption or, in the alternative, to grant her visitation rights under Tennessee Code Annotated § 36-6-306.[7] Grandmother argued that Father should have been estopped from

---

[6]Apparently, Mother took James and Kristina to Birmingham to visit Father and their paternal grandmother in August 1999.

[7]That statute provides:

**36-6-306. Visitation rights of grandparents.** – (a) Any of the following circumstances, when

(continued...)

claiming that he had not willfully abandoned the children based on the findings of the divorce court in the parenting plan adopted in the divorce decree. Grandmother also argued that the trial court's conclusion that Father had not abandoned the children was contrary to the weight of the evidence presented at trial. On October 10, 2001, the trial court denied Grandmother's motion. From that order, Grandmother now appeals.

On appeal, Grandmother makes essentially the same arguments as she did in the trial court. She argues that Father is estopped from claiming that he did not willfully abandon the children based on the language in the parenting plan incorporated into the divorce decree. In the alternative,

---

[7](...continued)
presented in a petition for grandparent visitation to a court of competent jurisdiction, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents:
    (1) The father or mother of an unmarried minor child is deceased;
    (2) The child's father or mother are divorced, legally separated, or were never married to each other;
    (3) The child's father or mother has been missing for not less than six (6) months;
    (4) The court of another state has ordered grandparent visitation; or
    (5) The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent or parents (this grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child).
 (b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:
    (A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;
    (B) The grandparent functioned as a primary caregiver such that cessation of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or
    (C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.
    (2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:
    (A) The child resided with the grandparent for at least six (6) consecutive months;
    (B) The grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months; or
    (C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.
 (c) Upon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered.
 (d)(1) Notwithstanding the provisions of § 36-1-121, if a relative or stepparent adopts a child, the provisions of this section apply.
    (2) If a person other than a relative or a stepparent adopts a child, any visitation rights granted pursuant to this section before the adoption of the child shall automatically end upon such adoption.

Tenn. Code Ann. § 36-6-306 (2001).

Grandmother argues that the evidence preponderates against the trial court's finding that Father did not willfully abandon the children. Because Father abandoned the children, Grandmother argues, his parental rights should be terminated, and she should be permitted to adopt the children and keep them in her custody. In response, Father contends that in these proceedings, he should not be bound by the finding of abandonment in the divorce decree because Grandmother was not a party to the divorce, and because circumstances have changed since the divorce decree was entered. Father maintains that the evidence at trial supported the trial court's conclusion that continuing his parental relationship with the children did not put them at risk of substantial harm.

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness afforded to the trial court's findings of fact. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo*, affording those legal determinations no such presumption of correctness. *Id.* Thus, absent error of law, the decision of the trial court is affirmed on appeal unless the evidence preponderates against the trial court's factual findings. *See Bryant v. Bryant*, No. M1999-01280-COA-R3-CV, 2000 WL 1483217, at *2 (Tenn. Ct. App. Oct. 10, 2000).

In considering the issues on appeal, as noted above, the trial court considered contemporaneously Grandmother's petition for adoption and Father's petition for custody. The two petitions, however, involve separate inquiries, and the resolution of one petition may not necessarily dictate the disposition of the other. First, we will consider the trial court's decision regarding Grandmother's petition for adoption.

At the outset, it must be noted that Grandmother's petition for adoption did not expressly seek the termination of Father's parental rights. Rather, her petition for adoption stated that Father had willfully abandoned his children "for four consecutive months immediately preceding the filing of this petition," and that his residence was unknown and could not be ascertained by diligent search and inquiry. Thus, the petition included an implicit request for termination of his parental rights. Further, the petition asserted that "there has been full compliance with the law in regard to consent to this adoption and/or termination of parental rights by all birth and/or legal parents." It soon became apparent, however, that Father did not consent to Grandmother's adoption of the children, as evidenced by his own petition to the court asserting his parental rights and seeking custody. Consequently, Grandmother was required to seek to have Father's parental rights terminated, in order for the children to be available for adoption. At trial, the parties clearly litigated the issue of whether Father's parental rights should be terminated, and the trial court made a determination on that issue. Therefore, although Grandmother's petition for adoption did not include an explicit request for the termination of Father's parental rights, the parties litigated the issue without objection, i.e. by consent, and the trial court properly adjudicated the matter. *See* Tenn. R. Civ. P. 15.02. Thus, we must address whether the trial court's decision regarding the termination of Father's parental rights was contrary to law or against the weight of the evidence.

"Few consequences of judicial action are so grave as the severance of natural family ties." ***M.L.B. v. S.L.J.***, 519 U.S. 102, 119 (1996) (quoting ***Santosky v. Kramer***, 455 U.S. 745, 787 (1982) (Rehnquist, J., dissenting)). It is well-established that a parent has a fundamental right to the care, custody, and control of his or her child. ***See Stanley v. Illinois***, 405 U.S. 645, 651 (1972). Under the state and federal constitutions, a natural parent's rights can be severed only upon "an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." ***In re: Swanson***, 2 S.W.3d 180, 188 (Tenn. 1999). Thus, to safeguard the sanctity of the parent-child relationship, courts must apply the heightened "clear and convincing" proof standard to determine whether parental rights should be severed.

Tennessee Code Annotated § 36-1-113(c) incorporates this heightened standard of proof, providing that the termination of parental rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). The existence of *any* statutory basis for termination of parental rights will support a trial court's decision to terminate those rights. ***In re: C.W.W.***, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). Thus, the termination of Father's parental rights must be based on clear and convincing evidence that a statutory ground for such termination exists, and also based on clear and convincing evidence that termination is in the best interest of the children.

In this case, the only statutory ground asserted for terminating Father's parental rights is his alleged abandonment of the children under Tennessee Code Annotated § 36-1-113(g)(1).[8] Under that statute, a claim for the termination of a parent's right may based on "[a]bandonment by the parent or guardian, as defined in § 36-1-102." Tenn. Code Ann. § 36-1-113(g)(1) (2001). Section 36-1-102 provides in pertinent part:

> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental

---

[8] Grandmother did not specifically cite this statutory ground in her complaint, but it is clear from the language of the complaint and her position in the proceedings below that her claim for termination is based on Father's abandonment of the children.

rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

\* \* \*

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

\* \* \*

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child; and

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled . . . .

Tenn. Code Ann. § 36-1-102(1) (Supp. 2002).

Thus to determine whether Father "abandoned" James and Kristina for purposes of terminating his parental rights under Tennessee Code Annotated § 36-1-113(g)(1), the definition of that term in section 36-1-102(1)(A) must be applied. *See* Tenn. Code Ann. § 36-1-102(G). Under section 36-1-102(1)(A), "abandonment" occurs when, for a period of four months immediately preceding the filing of a petition to terminate parental rights, the parent has "either . . . willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child . . . ." Tenn. Code Ann. § 36-1-102(1)(A)(i). Contrary to prior law, "it shall not be

required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." Tenn. Code Ann. § 36-1-102(G); *see Swanson*, 2 S.W.3d at 184-85. In order to safeguard a parent's fundamental right to the care and custody of his child, the parent's failure to support or make reasonable payments toward the support of his or her child must be found to have been willful. *Swanson*, 2 S.W.3d at 188. Requiring a showing of willfulness in the failure to support the child allows "for the type of individualized decision-making which must take place when a fundamental constitutional right is at stake." *Id.* Therefore, abandonment is established by showing *either* that a parent willfully failed to visit *or* willfully failed to support the child during the four-month period preceding the petition.

Grandmother argues that, under the statutes, the record contains clear and convincing evidence that Father abandoned James and Kristina for at least the four month period preceding the filing of Grandmother's petition. She contends that Father's own testimony demonstrates that he engaged in nothing more than "token" visitation or support for the two years prior to Grandmother's petition. Grandmother argues that Father's failure to visit was clearly willful, because Father acknowledges that he was aware of where the children were living, but nevertheless did not visit them. Moreover, Father's failure to pay support was willful in that he was consistently employed during the pertinent time period, but nonetheless chose not to send regular support payments. In response, Father argues that the proof at trial does not amount to clear and convincing evidence that his failure to visit and support the children was the result of willfulness. He contends that, when he went to Grandmother's house on February 12, 2001, shortly after Mother's death, to get custody of James and Kristina from Grandmother, he cured any alleged abandonment. His visit on that day could not be deemed to be "token" visitation, Father argues, because at that time he manifested an intent to assume complete care, custody, and control over the children.

We address first whether the evidence shows that Father willfully failed to support James and Kristina. The evidence on this issue is largely undisputed. Grandmother testified that, between the time the preliminary child support order was entered in August of 1999 until the time of the petition filed in this case, Father had paid Mother $625 (5 weeks at $125 each) in support. Father acknowledged that he had paid a total of only "two or three" months of court-ordered child support to Mother, and that he "didn't send support on a regular basis," commenting that "it was by no means what [he] should have paid." In his October 19, 2000 e-mail to Mother, Father conceded that he had not been making the court-ordered child support payments. Under the undisputed evidence, then, Father's payment of support can at most be characterized as "token." Tenn. Code Ann. § 36-1-102 (1)(B) (2001).

The issue becomes whether Father's failure to make any support payments within the four months preceding the filing of Grandmother's petition was "willful."[9] At trial, when asked about

---

[9] The current definition of "willfully failed to support" is the failure to make a monetary support payment toward the child's support "for a period of four (4) consecutive months." Tenn. Code Ann. § 36-1-102(1) (D). In *Swanson*, the Tennessee Supreme Court held that this definition is unconstitutional because it "may be read to permit termination of parental rights even when the failure to pay support was not intentional." *Swanson*, 2 S.W.3d at 188. The court held, (continued...)

the stability of his work, Father responded that he "never [had] been without employment." (Id.). It is undisputed that Father knew where his children were and where to send the payments had he chosen to do so. Father's only explanation for his failure to support was that sometimes he did not make much money, that his income depended on the jobs he received.

Under these circumstances, it is established by undisputed evidence that Father's failure to pay child support for James and Kristina was willful. *See Bryant*, 2000 WL 1483217, at *5 (determining that a father, who was able but did not contribute to the support of his children, had abandoned his children under the statute). Therefore, under section 36-1-102(1)(A), Father "abandoned" James and Kristina, and grounds for termination of his parental rights have been established pursuant to section 36-1-113(g)(1).

Grandmother argues that Father also abandoned James and Kristina by not visiting them. She notes the finding by the divorce court in the parental plan incorporated in the divorce decree, that Father had abandoned the children "for an extended period of time." Indeed, as of the date of the divorce, it is clear that Father had in fact abandoned them. In his testimony, Father indicates that Mother was uncooperative with his attempt to set up a visit, pointing to her reply to his email in which she noted that he had not been sending her the court-ordered child support. Yet he also noted that Mother brought the children to Birmingham, where he was living, and they saw him there. Father's visitation with the children as of the date of the divorce can only be characterized as "token." *See* Tenn. Code Ann. § 36-1-102(1)(C). This is consistent with Father's choice to permit the divorce decree to be taken by default.

Father argues that any abandonment that had occurred as of the date of the divorce was "cured" by his visit to Grandmother's home with police officers a few days after Mother's death, because he went there with the intent to take immediate custody of the children. Since this took place within a few days prior to the filing of Grandmother's petition, it would in fact be considered in determining whether Father had abandoned the children by failing to visit them. It is not necessary, however, for us to address this, since at no point did Father send either Mother or Grandmother financial support for his children. Thus, by the undisputed evidence, he had abandoned them. Under Tennessee law, a parent who abandons his child is deemed an unfit parent. *See Swanson*, 2 S.W.3d at 188 ("Certainly, a parent who has abandoned his child, either by willfully failing to visit or by willfully failing to support, is unfit."). Therefore, as of the date that Grandmother filed her petition, grounds for termination of Father's parental rights existed.

---

[9](...continued)
therefore, that the definition of "willfully failed to support" as it existed under prior law should be applied, and that the prior definition contained an element of willfulness. *Id.* at 189 & n.14; *see In re: Copeland*, 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000) (noting that former version of the statute contains an element of intent, but does not contain a separate definition of "willfully failed to support or make reasonable payments toward such child's support"). Thus, we must determine whether Father's failure to support was willful.

Once it is found by clear and convincing evidence that a ground for termination exists, then it must be determined, by clear and convincing evidence, whether termination of the parent's rights is in the best interest of the children. Tenn. Code Ann. § 36-1-113(c)(2). Tennessee Code Annotated § 36-1-113(i) sets out factors for a court to consider in determining whether the termination of a parent's rights would be in the best interest of the children involved:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2001).

In this case, however, because the trial court found that grounds for termination of Father's parental rights did not exist, the trial court did not reach the issue of whether termination would be

-12-

in the best interest of the children. Therefore, the trial court's factual finding that Father had not abandoned the children must be reversed, and the cause remanded to the trial court for consideration of whether termination of Father's parental rights is in the best interest of these children, utilizing the factors set forth in section 36-1-113(i).

If the trial court determines that Father's parental rights should be terminated, there would be no issue regarding Father's petition for custody, since an award of custody to Father would clearly be inappropriate. If, however, it is determined that it is not in the best interest of the children to terminate Father's parental rights and, consequently, Grandmother's petition for adoption is denied, Father's petition for custody must be considered. In determining custody as between a parent and a non-parent, "the parent cannot be deprived of custody of the child unless there has been a finding . . . that substantial harm threatens the child's welfare if custody is given to the parent." *Dean v. Compton*, No. M1998-00052-COA-R3-CV, 2000 WL 329351, at *13 (Tenn. Ct. App. Mar. 30, 2000). "Sufficient grounds for a non-parent to seek custody of a child might include unfitness of the parent and dependency and neglect of the child." *Id.* (citing *In re Askew (Lewis v. Donoho)*, 993 S.W.2d 1, 3-5 (Tenn. 1999)). Once there has been a finding that the parent is unfit or that the child is at a risk of substantial harm in the custody of the parent, then "the trial court may evaluate custody in light of the best interests of the child." *Id.* at *15. In this case, the trial court concluded that substantial harm was not a threat to the children's welfare if custody were awarded to Father. As noted above, however, since the undisputed evidence establishes that Father willfully abandoned the children, under Tennessee law, he is deemed unfit. Therefore, on remand, if the trial court finds that it is not in the best interest of the children to terminate Father's parental rights, it must still conduct a separate analysis to determine whether it is in the best interest of the children to grant custody to Father or to permit the children to remain in Grandmother's custody.

The decision of the trial court is reversed and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs are to be assessed to the appellee, Jason Lee Richardson, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, J.